UNITED STATES of America, Appellee,

v.

Ahmad NADI and My Brands, Inc.,
Defendants–Appellants.

Docket 93–1069 No. 1521.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1993.

Decided June 10, 1993.

Barry E. Schulman and Michael A. O'Connor (Schulman & Laifer, Brooklyn, NY), for defendants-appellants.

Christopher P. Reynolds and Nelson W. Cunningham (Roger S. Hayes, U.S. Atty. for the S.D. of N.Y., on the brief), for appellee.

Before: PRATT and MINER, Circuit Judges, and MISHLER, District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

MISHLER, District Judge:

## BACKGROUND

The Defendants were found guilty on all counts of a superseding information [1] charging them with two counts of unlawfully presenting false claims to the Government in connection with military supply contracts, in violation of 18 U.S.C. § 287 (the False Claims Act), and one count of executing and attempting to execute a scheme to defraud the United States, in connection with a Government procurement contract valued in excess of $1,000,000, in violation of 18 U.S.C. § 1031 (the Major Fraud Act). Defendant Nadi was sentenced to fifteen months in prison and a two-year supervisory release period, fined $10,000, and ordered to perform 100 hours of community service. Defendant My Brands, Inc., was fined $5,000.

In late 1990 and early 1991, the Department of Defense awarded two contracts to supply packaged salt and pepper to American troops in the Persian Gulf: one contract for packaged salt for $426,000 and one con-

1. Defendants waived their right to indictment by     grand jury.

tract for packaged pepper for $1,074,000. The contracts were awarded to Robbins Sales Co. ("Robbins"), a broker with no production capacity of its own. My Brands, a Bronx based condiment packager, was to perform the contracts as the only subcontractor.[2]

Under the contracts, the Government had the right to terminate performance unilaterally. In the event of termination, My Brands had the corresponding right to claim reimbursement for actual "out of pocket" expenses. Department of Defense auditors were charged with determining the reimbursement amount.

In order to produce the large amounts of salt and pepper the contracts required, My Brands expanded its plant's capacity. Nadi reached a purchase order agreement with Darrell Gilliam, president of Suffolk Mechanical, Inc., ("SMI"), under which My Brands would purchase five condiment packaging machines from SMI at a cost of $50,000 per machine. During the Government's inspection to confirm My Brands' ability to perform the contracts, Nadi gave the Government inspector a copy of the purchase order agreement with SMI to prove that his plant would soon be able to do the job. The agreement reflected a price of $50,000 per machine. Later, Gilliam delivered four machines but received payment from My Brands for only two. The billing statements Gilliam sent in connection with payment reflected a price of $50,000 per machine.

After Operation Desert Storm ended, the Government terminated related supply contracts, including the salt and pepper contracts with My Brands. Pursuant to the contracts' terms, the Government invited My Brands to file claims for reimbursement of its expenses. In reply, My Brands sent the Government a letter in March 1991 listing its expenses and costs under the contracts. Included in the list was a $575,000 expense for five condiment packaging machines at $115,000 each.

In May 1991, Nadi asked Gilliam to issue a billing statement reflecting the price of the machines at $115,000 each. In July 1991, My Brands submitted and Nadi signed reimbursement claims on both the pepper contract and the salt contract. Both submissions contained a line entry claiming a $575,000 expenditure for five condiment packaging machines. In August 1991, Government auditors began a routine audit of Nadi's claims. The auditors met with Nadi and requested documentation for each expense item in the claims. In support of the $575,000 item, Nadi turned over copies of the statements he had received from Gilliam.

In late November 1991, Government auditors and Nadi held a series of meetings. At a meeting on November 26, 1991, Sansone, the Government auditor, asked Nadi for additional documentation to support the invoices showing the cost of each machine to be $115,000. Nadi then contacted Gilliam and asked Gilliam to make invoices to match the statements reflecting a $115,000 price per machine which Nadi later received. By this time, a criminal investigation had begun, and Gilliam was cooperating with it.

On December 3, 1991, Nadi met with Government auditors and handed over the "false" invoices he had obtained from Gilliam as support for his claims. Soon after, Nadi was arrested, charged, and later convicted of violations of the False Claims Act and the Major Fraud Act. Defendants appeal their convictions on the ground, *inter alia*, that section 1031 of the Major Fraud Act is void for vagueness. .

## DISCUSSION

Defendants claim that the Major Fraud Act, 18 U.S.C. § 1031, is unconstitutionally vague. 18 U.S.C. § 1031 states in pertinent part:

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any procurement of property or services as a prime contractor with the United

---

**2.** The pepper contract listed the contractor as "My Brands, Inc., c/o Robbins Sales Co."

States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, *if the value of the contract, subcontract, or any constituent part thereof, for such property or services is $1,000,000 or more* shall ... be fined not more than $1,000,000, or imprisoned not more than 10 years, or both. 18 U.S.C. § 1031 (emphasis added).

Defendants allege that 18 U.S.C. § 1031 is void for vagueness on its face and as applied in this case. Specifically, they contend that because the statute fails to define the phrase "value of the contract," it fails to specify with sufficient definiteness what conduct is prohibited and thus, permits arbitrary and discriminatory enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974).

■ A defendant claiming a statute is fatally vague on its face must show that the statute is vague "in the sense that no standard of conduct is specified at all." *United States v. Schneiderman,* 968 F.2d 1564, 1567 (2d Cir.1992) (quoting *Village of Hoffman Estates v. The Flipside,* 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362) (1982), *cert. denied* —— U.S. ——, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993). The defendant bears the burden of showing the statute to be "impermissibly vague in all of its applications." *Schneiderman,* 968 F.2d at 1568 (citing *Hoffman Estates* ). Lastly, vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity. *See Chapman v. United States,* —— U.S. ——, ——, 111 S.Ct. 1919, 1929, 114 L.Ed.2d 524 (1991); *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975).

Because section 1031 clearly prohibits executing a scheme to defraud the United States in any procurement of property where there is a prime contract if the value of the contract, subcontract or any constituent part thereof is $1,000,000 or more, the statute is not vague on its face. In addition, Defendants' challenge to the facial validity of the statute fails because section 1031 does not implicate First Amendment interests. Therefore, we address Defendants' vagueness challenge on an as applied basis.

■ When the challenge is vagueness "as-applied", there is a two-part test: a court must first determine whether the statute " 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law 'provide[s] explicit standards for those who apply [it].' " *Schneiderman,* 968 F.2d at 1568 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (footnote omitted)); *see also Gentile v. State Bar of Nev.,* —— U.S. ——, ——, 111 S.Ct. 2720, 2732, 115 L.Ed.2d 888 (1991); *Village of Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193. Because the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness. *See Village of Hoffman Estates,* 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7; *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974).

The Defendants claim that the statute fails to define "value of the contract" and, thus, creates a trap for the unwary and permits arbitrary enforcement. However, the common sense interpretation of "the value of the contract" is confirmed by the statute's legislative history: "[t]he phrase 'value of the contract' refers to the value of the contract award, or the amount the government has agreed to pay to the provider of services whether or not this sum represents a profit to the contracting company." S.Rep. No. 503, 100th Cong., 2d Sess. 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5969, 5975–76. The value of the contract is the contract price: the amount agreed to by the parties that one will pay to the other in exchange for goods or services. This does not end the matter, however. In the context of large Government projects, there are often several contracts, subcontracts, and smaller agreements bound up in a single award. As a result, the question remains: which contract are we to look to in determining the "value of the contract" under the statute? The Government urges that we adopt a rule whereby the "value of

the contract" is the value of the prime contract between the Government and the prime contractor, regardless of the value of any individual subcontract. Thus, a subcontractor would face liability if he or she perpetrated a fraud in connection with a subcontract valued at less than $1,000,000 where the prime contract is valued at $1,000,000 or more. Defendants argue for a rule whereby the "value of the contract" is the value of whichever contract is the subject of the fraud: either the prime contract or an individual subcontract. Thus, a subcontractor would *not* face liability if he or she perpetrated a fraud in connection with a subcontract valued at less than $1,000,000 even where the prime contract was valued at $1,000,000 or more.

As an initial matter, we note that, on either reading, the Defendants' conduct falls within the ambit of the statute. It is undisputed that both the prime contract for pepper between the Government and Robbins, and the subcontract between Robbins and My Brands called for payments of $1,000,000 or more. The prime contract called for payment of $1,074,000 and the subcontract for $1,019,000. Thus, the Defendants' conduct was clearly proscribed by the statute and, therefore, they cannot successfully challenge it for vagueness. *See Village of Hoffman Estates*, 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7.

Nonetheless, we find that a reasonable reading of the statute, in light of the legislative history, requires that we adopt the rule, argued for by Defendants, whereby the value of the contract is determined by looking to the specific contract upon which the fraud is based. So, for example, in a case where the value of a subcontract is less than $1,000,000 but the prime contract is for $1,000,000 or more, the subcontractor would escape liability under section 1031. We adopt this rule with reference to the language of the statute.

The phrase "... if the value of the contract, subcontract, or any constituent part thereof ..." tracks the preceding phrase, which reads "... as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract...." 18 U.S.C. § 1031. We interpret this tracking language to mean that where the prime contractor is accused of fraud, we look to the value of the prime contract, but where the subcontractor is accused of fraud we look to the value of the subcontract, and where the supplier is accused of fraud we look to the value of the related constituent part of the contract.

This reading avoids the potential anomaly of small subcontractors whose subcontracts are valued at far less than $1,000,000 being prosecuted under the Act simply because the prime contract is for $1,000,000 or more. The legislative history supports this view. First, we note that in explaining the phrase "value of the contract," the Senate committee stated: "Furthermore, a subcontractor awarded a subcontract valued at $1,000,000 or more is covered by this section, regardless of the amount of the contract award to the contractor or other subcontractors." S.Rep. No. 503, *supra*, at 12, *reprinted in* 1988 U.S.C.C.A.N. at 5976. Thus, the committee instructs that, in the case of a subcontractor, the value of the subcontract is controlling and not the value of the prime contract or other subcontract. The committee, in making this statement, apparently had in mind situations where an individual subcontract is of greater value than the prime contract. We may infer from this that, where the subcontract is of lesser value than the contract, the value of the subcontract is also controlling.

Moreover, the committee report states that:

> The purpose of ... the Major Fraud Act of 1988, is to provide federal prosecutors with an additional criminal statute targeting major procurement fraud committed against the United States.

> . . . .

> Section 2 of the Major Fraud Act of 1988 would establish the criminal offense of major procurement fraud committed against the United States. This new provision would apply to fraud committed in connection with a contract, or subcontract or any part of a contract or subcontract worth at least $1 million.

*Id.* at 1–3, *reprinted in* 1988 U.S.C.C.A.N. at 5969–70. From this we understand that section 1031 is aimed at "major fraud", that "major" is defined in terms of the value of the contract or subcontract, and that $1,000,-000 is the triggering value. Further, we conclude that Congress did not intend to include, under the heading of "major fraud", frauds committed in connection subcontracts valued at less than $1,000,000. The opposite view would subject subcontractors to liability under the Major Fraud Act no matter how insignificant the value of their subcontracts. Such a view is at odds with the language of the statute and its legislative history. We conclude, therefore, that under section 1031 the value of the specific contract or subcontract to which the fraud is connected is controlling and not the value of related contracts or subcontracts. As we stated previously, even on this reading, the Defendants' conduct was clearly proscribed by the statute and therefore, they cannot successfully challenge it for vagueness. *See Village of Hoffman Estates,* 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7.

With regard to the second prong set forth in *Schneiderman,* 968 F.2d at 1568, whether the law "provide[s] explicit standards for those who apply [it]," we find that section 1031 is sufficiently clear to prevent its arbitrary or discriminatory application. The statute sets forth clear requirements to guide prosecutors. It targets schemes to defraud the United States in connection with procurement contracts executed by (1) prime contractors with the United States, or (2) subcontractors or suppliers on contracts in which there is a prime contract with the United States. Moreover, the statute's application is limited to situations where the value of the prime contract, subcontract, or any constituent part thereof, is $1,000,000 or more. Clearly, "[e]ffective law enforcement often 'requires the exercise of some degree of ... [prosecutorial] judgment' but this alone does not render a statute unconstitutional." *Schneiderman,* 968 F.2d at 1568 (quoting *Grayned,* 408 U.S. at 114, 92 S.Ct. at 2302). Section 1031 is sufficiently clear and narrow in scope to eliminate potentially vague and arbitrary enforcement.

We conclude, therefore, that section 1031 is not unconstitutionally vague on its face or as applied to these Defendants.

We have considered the Defendants' other arguments and find them to be without merit.

### CONCLUSION

The judgment of conviction is affirmed.