

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-1998

# United States v. Sain

Precedential or Non-Precedential:

Docket 97-3114,97-3115

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Sain" (1998). *1998 Decisions.* Paper 78.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/78

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 10, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-3114 & 97-3115

UNITED STATES OF AMERICA

v.

SAMIR K. SAIN,
        Appellant No. 97-3114

UNITED STATES OF AMERICA

v.

ADVANCED ENVIRONMENTAL CONSULTANTS, INC.,
        Appellant No. 97-3115

Appeal from the United States District Court
For the Western District of Pennsylvania
D.C. Nos. 96-cr-00021-01 &
96-cr-00021-02

Argued January 22, 1998

Before: SLOVITER, LEWIS and ROSENN, Circuit Judges

(Opinion Filed April 10, 1998)

        Thomas J. Farrell (argued)
        Bonnie R. Schlueter
        Office of United States Attorney
        633 United States Post Office &
        Courthouse
        Pittsburgh, PA 15219
        Counsel for Appellee

          Bruce A. Antkowiak (argued)
          One Northgate Square
          Greensburg, PA 15601
          Counsel for Appellants

          J. Daniel Hull
          Rhoda S. Neft
          April L. Boyer
          J.D. Hull Associates
          600 Grant Street
          4949 USX Tower
          Pittsburgh, PA 15219
          Counsel for Advanced Environmental
          Consultants, Inc.

OPINION OF THE COURT

ROSENN, Circuit Judge.

This case primarily presents two questions of first impression in this circuit relating to the interpretation of the Major Fraud Act of 1988 (the "Act"). See 18 U.S.C. S 1031 (West 1997). The Act makes it a federal crime to defraud the United States in connection with a government contract that is valued in excess of $1 million. Specifically, we must decide whether a defendant may be charged with a separate violation of the Act for each of numerous executions of a single fraudulent scheme, and whether modifications of the original government contract, each of which have a value of less than $1 million, are within the purview of the Act when the underlying government contract has a value in excess of $1 million. The defendants make other arguments relating to the sufficiency of the evidence, the exclusion of expert testimony, whether an individual can be convicted of aiding and abetting a corporation he owns and controls, and alleged defects in their sentences. The district court rejected the defendants' arguments. We affirm as to all issues.*

_____

* Although Judge Lewis heard argument in this case, he has been unable, however, to clear this written opinion because of illness.

I.

A federal grand jury sitting in the Western District of
Pennsylvania indicted Samir K. Sain and his company,
Advanced Environmental Consultants, Inc. ("AEC"), on 46
counts of fraud in violation of the Act. Following trial, the
petit jury returned guilty verdicts on all counts as to both
defendants. The district court sentenced Sain to 37 months
imprisonment and three years supervised release. The court
sentenced AEC to five years probation and ordered it to pay
a special assessment. In addition, the court ordered AEC to
pay $597,124 in restitution, with any amount not paid by
AEC to be paid by Sain. The defendants appealed.1

II.

This complex fraud case arises out of an approximately
$7-million contract between the United States Army and
AEC, pursuant to which AEC built, owned, and operated a
waste-water treatment plant at the Army Depot at Tooele,
Utah. AEC is an environmental consulting company
headquartered in Pittsburgh and incorporated in
Pennsylvania. Sain has a masters degree in engineering
and several credits toward a doctorate, is a licensed
professional engineer, and is the sole shareholder and
president of AEC.2 It is well established that, because the
jury returned guilty verdicts in the district court, this Court
must construe the evidence in the light most favorable to
the Government. See, e.g., Glasser v. United States, 315
U.S. 60, 80 (1941); United States v. Cooper, 121 F.3d 130,
133 (3d Cir. 1997). Following is a statement of facts which
the jury could have found based on the trial evidence.

The Army operates a depot in Tooele, Utah, at which it

_____

1. The district court had subject-matter jurisdiction of the case pursuant
to 18 U.S.C. S 3231. This Court has appellate jurisdiction pursuant to 28
U.S.C. S 1291 and 18 U.S.C. S 3742(a)(2).

2. Until several days before trial, Sain claimed to hold a Ph.D. in
engineering from the University of Pittsburgh. He made this
representation to the Army when he bid on the contract. Just prior to
trial and on cross-examination at trial, he admitted that he did not hold
such a degree.

3

services tanks and other types of military vehicles. Sometime in the 1980s, the Army entered into a consent decree with the State of Utah requiring the Army to treat the waste water it was generating at the depot and releasing into the ground water. To fulfill its obligation under this consent decree, the Army proposed to have a contractor build, own, and operate a plant to treat the depot's waste water. After the bidding process, AEC was selected. On November 30, 1987, AEC entered into the contract with the Army. Under the contract, AEC agreed to construct, own, and operate an industrial waste-water treatment plant at the depot for the "firm fixed price" of approximately $4.5 million. In a firm fixed price contract, once the price is established by the parties, the amount paid to the supplier of the goods or services does not vary with its costs. In this case, the risk of cost overruns rested with AEC. The term of the contract was for one year followed by four one-year options. The Army exercised each option and the contract lasted the full five years.

In the plant, AEC installed four large metal tanks called "adsorbers." Each of the tanks was designed to hold approximately 5,000 pounds of filtering carbon. Waste water would be pumped through the tanks with the carbon filtering out much of the water's pollutants. Periodically, as pollutants built up in the carbon, the carbon would become ineffective and have to be replaced. The process of replacing the carbon was called a "change out." The contract provided for two of these change outs per year at AEC's expense and did not specify the type of carbon to be used.

After the Army and AEC entered into the contract, but before AEC began operating the plant, the Army modified the contract to incorporate the City of Tooele's water purity standards which were more strict than those imposed by the consent decree. The Army requested that AEC submit a cost proposal providing for the Army to reimburse AEC for its increased costs resulting from these stricter water purity standards. Ultimately, AEC submitted four cost proposals, none of which were approved by the Army. Instead, on April 11, 1989, the Army unilaterally imposed a modification of the contract pursuant to which AEC would receive approximately $682,000 in addition to the original contract price.

4

In the spring of 1989, before the Army had acted on AEC's fourth cost proposal, AEC claimed that the waste water generated by the Army consistently contained a higher level of pollutants than the amounts specified in the contract. According to AEC, this higher level of pollutants required more than the two carbon change outs per year allowed by the contract. In an attempt to recoup these additional costs, AEC began submitting claims to the Army for reimbursement for costs associated with the additional change outs. On May 5, 1989, May 26, 1989, and June 20, 1989, AEC submitted claims. Each claim was for $27,500 and purported to represent the costs associated with a complete change out of the four tanks plus a 10-percent profit for AEC. According to the claims, AEC installed 5,000 pounds of carbon in each of the four tanks at a cost of $1.25 per pound of carbon, a price which corresponded to the market price for virgin carbon.

The Army agreed that these changed conditions warranted an equitable adjustment of the contract to compensate AEC for the costs of some of the additional carbon change outs. Lieutenant Colonel K. L. Andrews, the Army officer responsible for administering the AEC contract during most of the relevant time, notified Sain in a letter dated April 25, 1989 that no money would be paid to AEC by the Army for the additional carbon change outs unless AEC first submitted "documentation necessary to support a claim." Andrews advised that such documentation include "cost invoices, time sheets, and any other [necessary] documentation." Also, at trial, Andrews testified that, in addition to the notification letter, he told Sain numerous times that supporting documentation was required in order for AEC to receive payment. At trial, Sain reluctantly conceded that Andrews had required this documentation.

According to the testimony of Andrews and Robert Kinsinger, the Army's technical representative at the waste-water plant, prior to agreeing to reimburse AEC for the additional change outs, Sain insisted to them that the heavy pollutant levels in the waste water required the use of virgin carbon, a more expensive type of carbon than reactivated carbon.[3] Sain also insisted that 5,000 pounds of this carbon per tank, or 20,000 pounds total, must be used

_____

3. Virgin carbon has not been previously used in water purification. Reactivated carbon has been previously used to filter water and heated to high temperatures in order to rid the carbon of the impurities and re-open its pores.

5

in each change out.

To substantiate the initial costs associated with the additional change outs, Sain submitted to the Army a copy of an invoice numbered "326" and dated January 9, 1989 which purported to show that AEC had purchased 100,000 pounds of carbon from a company called Encotech for $1.25 per pound. This price corresponded to the market price for virgin carbon and included a charge for installation. Sain also submitted to the Army a September 5, 1989 letter on Encotech letterhead which stated that AEC had previously purchased the 100,000 pounds of carbon for the price stated in invoice number 326.

It is undisputed that the invoice and letter were false. Both Sain and Encotech's owner, Bernard Lalli, testified that the carbon order had been canceled on January 15, 1989 and that the carbon was not delivered. Sain also admitted "whiting out" the portion of the original invoice which contained a notation that the order had been canceled and that he had assisted Lalli in drafting the September 5 letter. Sain claimed that the invoice represented future costs. Sain had, however, purchased some carbon from Encotech during this time, although it was not virgin carbon. AEC initially ordered 50,000 pounds of virgin carbon at $1.18 per pound. AEC never took delivery of this virgin carbon. Instead, Sain asked Lalli to substitute 100,000 pounds of the less expensive, reactivated carbon, which Lalli did for a price of $.59 per pound. On other occasions, Sain similarly represented to the Army that he had purchased virgin carbon. He did not take delivery of this carbon and substituted cheaper, reactivated carbon without informing Army officials.

Based on Sain's representations regarding the price of the carbon used in the additional change outs, the Army agreed to reimburse AEC $1.2455 per pound of carbon for the 20,000 pounds used per change out, plus 10-percent profit for a total of $27,401 per change out. AEC and the Army memorialized this agreement in Contract Modification 14 which reimbursed AEC for the three claims previously submitted. In part, the modification stated: "The costs associated with this claim are a replacement of 60,000 lbs. of virgin carbon (3 change outs/20,000 lbs. per change)

and the labor and fees involved. ... All other terms and conditions in the contract remain the same." Sain acknowledged on cross-examination that he understood the purpose of the modification was to reimburse him for the three change outs using 60,000 pounds of virgin carbon.

Sain made an additional 43 claims for reimbursement for costs associated with the additional carbon change outs. To support these claims, he submitted false and canceled supplier invoices. He concealed from the Army invoices showing the purchase of reactivated carbon, and he falsely certified that AEC had used 20,000 pounds of virgin carbon per change out when, in fact, it had not done so. In connection with Contract Modification 20, which covered the six claims following the original three, Sain submitted a purchase order from Encotech which showed the purchase of 100,000 pounds of virgin carbon for $99,000 and a copy of a $99,000 check from an AEC checking account. Sain, however, canceled the invoice, voided the check, and never took delivery of this carbon. He also included in the supporting documentation an invoice for 25,000 pounds of virgin carbon priced at $1.18 per pound which AEC never received. Instead, AEC substituted 50,000 pounds of reactivated carbon. He also admitted to failing to submit documentation showing that he had used reactivated carbon.

Sain supported an additional 10 of the claims by using checks and purchase orders relating to a different supplier, Water Equipment Supply ("WES"), which was a sole proprietorship that Sain created. WES had no operations or employees. Sain instructed Lalli to bill WES for reactivated carbon that Encotech had shipped to AEC. WES then billed AEC for the carbon at highly inflated prices, misdescribing the carbon in the invoice. In these transactions, WES purchased 155,768 pounds of reactivated carbon from Encotech at prices ranging from $.32 to $.50 per pound. WES then billed AEC for 238,000 pounds of carbon at $.93 per pound and for another 100,000 at $.87 per pound. AEC paid these amounts to WES, but WES transferred the funds back to AEC and Sain. Sain instructed an AEC employee to describe the carbon on the WES invoices as "Iodine 1000 and up 10/40(v)." "Iodine 1000" refers to the density of the

carbon. The iodine level of carbon is determined by a standardized test. Reactivated carbon of this iodine level would have been very expensive and very rare. The carbon provided by Encotech did not have this high iodine number when supplied to AEC and the standard test had not been performed on it, although Sain testified that he used his own "test" to determine the iodine level.

In 1991, Army officials began to suspect that Sain was not using the quantity and quality of carbon called for in the contract modifications. They conducted an investigation which appeared to confirm their suspicions that Sain was using fewer than five of the 1,000-pound bags of carbon per tank. When confronted, Sain stated that each 1,000-pound bag contained 1,400 pounds. He testified to the same at trial, but admitted never calculating the exact weight of the bags. He also claimed that he had estimated how much volume 5,000 pounds would occupy and used that amount. Sain called this method "volumetric calculation." At this time, despite its investigation, the Army was unable to uncover sufficient evidence of Sain's fraud. However, on September 29, 1992, the Army added language to Contract Modification 33 which reaffirmed that payment of the $27,401 was contingent on Sain's use of 5,000 pounds of "pure, virgin activated carbon" per tank. 4 Sain signed that modification.

On December 14, 1992, the Army withheld payment of $211,800 that Sain had previously claimed and requested that AEC account for all of the carbon purchased and installed at the plant. Sain told the Army's representatives that his attorney, Keith Baker, would provide the requested information. Baker supplied a letter, a summary, and 18

_____

4. The modification read:

> The unit pricing for the above identified claims is based on the
> quantities (5,000 pounds) and quality (pure, virgin activated
carbon)
> which formed the mutual agreement in Modification Number
> P00014. In the event the quantity and/or quality of carbon material
> used in these carbon changes is found to be less than that upon
> which Modification Number P00014 is based, the Government
> reserves the right to adjust the Contract Amount to reflect such
cost
> difference.

8

invoices to the Army which purported to show that AEC had purchased and used 1,056,050 pounds of carbon. This matched almost exactly the amount of carbon which would have been used if AEC had installed 5,000 pounds per tank for the 212 change outs it had performed. In reliance on the representations in the summary submitted to it, the Army paid Sain much of the money he requested, reducing the payment for the last nine change outs to $16,409.67 per change out because the AEC-supplied documents showed that AEC paid only $.72 per pound of carbon during this time. At trial, Sain conceded that the numbers Baker supplied were incorrect. The Government established that AEC had actually purchased only 795,818 pounds of carbon and 24 of the 1,000-pound bags remained unused. Sain claimed that the omissions and misstatements in the letter, summary, and supporting documents were mistakes and denied that he intended to defraud the Army.

After an investigation, the grand jury indicted Sain and AEC for engaging in a scheme to defraud the Army. The indictment alleged that Sain and AEC falsely represented that only virgin carbon in 5,000-pound amounts was capable of properly cleaning the water. The indictment further alleged that AEC and Sain represented that they used this type and amount of carbon although oftentimes they were using reactivated carbon in lesser amounts and pocketing the difference in price. There is no dispute that the reactivated carbon in amounts of less than 5,000 used by AEC treated the waste water to the satisfaction of the Army and in compliance with the consent decree.

III.

On appeal, Sain and AEC make several arguments why their convictions should be reversed or sentences modified. We address each in turn. AEC did not file a separate brief and, where appropriate, has adopted Sain's arguments.

A.

Sain first argues that the district court erred in denying his motion for a judgment of acquittal on the ground that the evidence did not prove that he engaged in a fraudulent

scheme. We address Sain's sufficiency of the evidence argument first because, if he is correct, we would be required to order the district court to enter a judgment of acquittal on all counts, eliminating the need to consider any of his other arguments. See Burks v. United States, 437 U.S. 1, 17-18 (1977).

Sain contends that his misrepresentations to the Army were not "material." According to Sain, regardless of what the documents he submitted reflected, the Army did not make payment of the 46 claims based on the actual expenses incurred in the carbon change outs. Instead, the Army agreed to pay AEC the fixed price of $27,401 for each change out over the two change outs allowed in the contract regardless of whether AEC used virgin or reactivated carbon or in what amount, as long as the plant properly treated the depot's waste water. Hence, Sain argues, because the Army received what it bargained for-- namely, clean waste water--and did not rely on his false statements, his claims were not fraudulent.

Initially, we note that this court has not explicitly ruled that misrepresentations must be material in order to be actionable under the federal fraud statutes, although our cases strongly suggest that we would not so hold. See United States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct.") (citation omitted). We need not decide this issue because, as explained below, the evidence that the Army reasonably relied on Sain's misrepresentations is substantial. Hence, we leave the issue for another day.

A criminal defendant seeking reversal of his conviction based on a claim of insufficiency of the evidence bears a very heavy burden. Cooper, 121 F.3d at 133; Coyle, 63 F.3d at 1243. This Court must "affirm the convictions if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." Coyle, 63 F.3d at 1243 (citations omitted). If there is substantial evidence to support the jury's verdict, we will not reverse even though we might have made a different decision based on the evidence.

10

Cooper, 121 F.3d at 133; United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994).

According to the indictment, the defendants engaged in the following fraudulent scheme: Sain represented to Army officials that the waste-water treatment plant would only produce sufficiently pure water if each carbon change out consisted of 5,000 pounds of virgin carbon per tank. Based on these representations, the Government agreed to reimburse AEC for the costs of this type of change out. The contract modifications provided that the Army would reimburse AEC for the amounts it actually spent. Sain's representations were false; he knew that the plant would operate effectively even if he used less expensive, reactivated carbon in amounts of fewer than 5,000 pounds. Most of the time, AEC used less than 5,000 pounds of less expensive, reactivated carbon in the change outs, with Sain keeping the difference between the amount he claimed he spent and the amount he actually spent. To execute the scheme, Sain made false statements in the claim forms and hid from the Government information that he was using reactivated carbon and less than 5,000 pounds per tank per change out.

Our review of the record convinces us that there is more than substantial evidence supporting the Government's charge and establishing that Sain and AEC violatedS 1031. First, ample evidence establishes that Sain represented to the Army that 20,000 pounds of virgin carbon per change out must be used to treat the waste water effectively. Army technical representative Kinsinger and Lieutenant Colonel Andrews testified that Sain repeatedly told them that only virgin carbon would properly filter the water and that each tank must be filled with 5,000 pounds in order to operate effectively. Further, both Kinsinger and Andrews testified that the Army relied on Sain's representations. Contrary to Sain's argument, the Army required more than just the purification of its waste water. Each time Sain made a claim for expenses related to a change out, the Army required him to certify that he was using 20,000 pounds of virgin carbon per change out. Virtually all of the documents Sain provided to the Army purported to show that AEC either was using virgin carbon in 5,000-pound amounts or

11

using carbon with a price generally corresponding to the then-market price of virgin carbon. It would not have been necessary for Sain to submit such detailed documentation containing such representations if the Army did not care about the amount, type of carbon used and cost, and was only concerned with clean waste water.

Second, the evidence establishes that the Army agreed to pay AEC the full amount of the claim only if AEC used 20,000 pounds of virgin carbon per change out. According to Contract Modification 14, AEC was entitled to an adjustment of the original contract because of "costs associated with the excessive polluent (sic) level." Contract Modification 33 reaffirmed that language, providing that payment was predicated on AEC's using the quantity and quality of carbon described in Modification 14. Similarly, the claim forms and accompanying certifications and supporting documents submitted to the Army by AEC represented that AEC used carbon costing $1.25 per pound, the approximate market price of virgin carbon. If the contract modifications allowed AEC to recoup afixed amount regardless of his expenses, as Sain claims they did, there would have been little need to submit certifications and supporting documents. Further, Andrews testified that he advised Sain both orally and in writing that AEC would be reimbursed only if AEC provided sufficient evidence that it actually expended the money claimed.

Third, Sain conceded a key aspect of the Government's case. He admitted that the plant operated effectively even though he used reactivated carbon and less than 20,000 pounds per change out. Indeed, in his defense he contended that the jury should acquit him because he properly purified the Army's waste water and that his use of reactivated carbon in less than 20,000-pound lots was irrelevant to his arrangement with the Army. The effectiveness of reactivated carbon in amounts of less than 20,000 pounds was critical to the scheme because it permitted Sain to pocket the price difference between the quality and quantity of the carbon he told the Army he was using and the quantity and quality he in fact used.

Finally, there was substantial evidence that Sain submitted numerous false documents and hid from the

12

Government the truth that he was not using the quality and quantity of carbon that he had represented. For example, Sain provided to the Army Encotech invoice 326 and an accompanying letter which falsely claimed that AEC had purchased carbon for the approximate market price of virgin carbon when in fact it did not purchase that carbon; caused his attorney, Keith Baker, to submit a false summary of carbon usage and expenditures; and made several other purchases of reactivated carbon from Encotech, all the while representing to the Army that he was using virgin carbon.

At trial, the lynchpin of Sain's defense was that he and the Army negotiated a fixed price for each carbon change out. He claimed that he was entitled to use whatever type of carbon in whatever amount regardless of what the documents showed and the representations he made. The jury simply rejected Sain's characterization of his contracted obligations with the Army. There was substantial evidence to support the jury's verdict in light of the documents, the testimony of the Government's witnesses, and Sain's concessions in his testimony.

B.

Sain next argues that his convictions should be vacated because the Government failed to establish that he devised and executed a fraudulent scheme in connection with a contract valued at more than the $1 million minimum specified in the Act. See 18 U.S.C. S 1031(a) (outlawing fraud in connection with government contract "if the value of the contract ... is $1,000,000 or more"). He argues that the evidence established that each of the contract modifications was a separate contract and distinct from the main contract. Thus, he claims, any fraud he may have committed was in connection with each of the individual contract modifications and not the main contract. According to Sain, because the contract modifications were valued at less than $1 million each, his fraud in connection with them did not violate the Act. We disagree.

The Act provides:

13

> Whoever knowingly executes, or attempts to execute,
> any scheme or artifice with the intent--(1) to defraud
> the United States; or (2) to obtain money or property
> by means of false or fraudulent pretenses,
> representations, or promises, in any procurement or
> property or services as a prime contractor with the
> United States or as a subcontractor 8 if the value of
> the contract, subcontract, or any constituent part
> thereof, for such property or services is $1,000,000 or
> more shall ... be fined not more than $1,000,000 or
> imprisoned not more than 10 years, or both.

18 U.S.C. S 1031(a).

Sain relies on United States v. Nadi, 996 F.2d 548 (2d
Cir. 1993), which holds that "the value of the contract
[under the Act] is determined by looking to the specific
contract upon which the fraud is based." Id. at 551. In
Nadi, the government awarded two contracts for the
production of individual salt and pepper packets for
American troops in the Persian Gulf. The defendants were
hired to perform the contracts as the only subcontractor.
Under the contracts, the government was permitted to
terminate performance unilaterally. If performance was
unilaterally terminated, the defendants retained the right to
claim reimbursement for out-of-pocket expenses associated
with their performance of the contract. The defendants
purchased extra equipment in anticipation of producing the
salt and pepper packets. The government, however,
exercised its right to terminate the contract and invited the
defendants to submit a claim for their out-of-pocket
expenses. The defendants submitted inflated and
fraudulent claims. They were indicted and convicted of
violating the Act.

On appeal, they challenged their convictions on the
ground that the Act was void for vagueness because it did
not define the phrase "value of the contract." The
government argued that, for purposes of the Act, the prime
contract is always the contract to which the courts should
look when determining whether the $1 million minimum is
met even when the defendant is a party, and commits a
fraud with respect only to a subcontract. The United States
Court of Appeals for the Second Circuit disagreed. After

14

examining the legislative history, it rejected the general rule proferred by the government, reasoning that the contract on which the fraud is based is the relevant contract, whether it be a prime contract or a subcontract.

Sain acknowledges that the United States Court of Appeals for the Fourth Circuit's holding in United States v. Brooks, 111 F.3d 365 (4th Cir. 1997), is to the contrary. In Brooks, the court held that "regardless of its privity with the United States, any contractor or supplier involved in a prime contract with the United States who commits a fraud ... is guilty so long as the prime contract, a subcontract, a supply agreement, or any constituent part of such a contract is valued at $1 million or more." Id. at 368-69.

We need not decide whether to follow Brooks or Nadi, because we conclude that there was only one contract in this case. The contract modifications pointed to by Sain were simply that--modifications of the approximately $4.5 million original contract which ultimately increased in value to approximately $7 million. As modifications, they were not separate contracts and did not stand on their own; they merely changed some of the terms of the original contract. The modifications incorporated and referred back to the terms of the original contract, explicitly stating that that contract remained in effect. Each modification states that it is a "modification of contract/order no. DAAC89-88-C-0008 [the original contract]," but did not reduce the Government's financial liability under the contract. To the contrary, the modifications increased the total liability to almost $7 million. The modifications also state that "[a]ll other terms and conditions in the contract remain[sic] the same." Thus, the jury reasonably relied on this language in the modifications in concluding that even though Sain used the modifications to defraud the Army, the fraud intrinsically involved the approximately $7 million contract.

C.

Sain next argued that the indictment improperly charged him with a separate violation of the Act for each false claim he submitted. He claims he should have been charged only with a single count predicated on his devising the overall

15

fraudulent scheme. Because this claim requires interpretation of a statute, we exercise plenary review. See United States v. Cross, 128 F.3d 145, 147 (3d Cir. 1997).

By its plain language, the statute criminalizes each knowing "execution" of the fraudulent scheme and not simply devising the fraudulent scheme itself. (Emphasis added). The statute's contemplation that defendants could be convicted of "multiple counts" supports this reading. See 18 U.S.C. S 1031(c) (providing for a maximumfine of $10 million for defendants convicted of "multiple counts"). Our reading of the statute is consistent with this and other circuits' interpretation of the bank fraud statute, 18 U.S.C. S 1344,5 which contains language virtually identical to the Major Fraud Act. "The circuits that have addressed multiplicity in the context of bank fraud have consistently held that the ... statute `punishes each execution of a fraudulent scheme rather than each act in furtherance of such a scheme.' " United States v. Harris, 79 F.3d 223, 232 (2d Cir. 1996) (collecting cases from the Third, Fifth, Seventh, Ninth, and Tenth circuits), cert. denied, 117 S. Ct. 223 (1996); See United States v. Schwartz, 899 F.2d 243, 248 (3d Cir. 1990); United States v. Rimell, 21 F.3d 281, 287 (8th Cir. 1994).

Our determination that a defendant may be punished for each knowing execution of the fraudulent scheme does not end the inquiry, however. Not every act in furtherance of a fraudulent scheme is a separate "execution" of the scheme. In determining whether an action is a separate execution of a fraudulent scheme, courts look to whether the actions are substantively and chronologically independent from the overall scheme. See Harris, 79 F.3d at 232. In the instant case, each of the 46 false claims constituted a separate

_____

5. The bank fraud statute provides:

        "Whoever knowingly executes, or attempts to execute, a scheme or
        artifice--(1) to defraud a financial institution; or (2) to obtain
any of
        the moneys, funds, credits, assets, securities, or other property
        owned by, or under the custody or control of, afinancial
institution,
        by means of false or fraudulent pretenses, representations, or
        promises; shall be fined not more than $1,000,000 or imprisoned
        not more than 30 years or both."

16

execution of the scheme. Each was substantively independent from the overall scheme because each sought to obtain a separate amount of money from the government and caused the government a distinct loss. There is no evidence that the defendants had determined a specific amount of money that they wanted to obtain and took several steps to get that single amount. Rather, the evidence established that the defendants intended to obtain as much money as possible. Further, the false claims were chronologically distinct from each other in that each was submitted weeks or months apart over an approximately three-and-one-half-year period. In sum, we hold that a defendant may be separately punished under the Major Fraud Act for each execution of the fraudulent scheme and that each of Sain's false claims constituted a chronologically and substantially separate execution of the fraudulent scheme.

D.

Sain next argues that he cannot be convicted of violating the Act because the Act only permits conviction of an entity or individual that actually contracted with the United States, and AEC, not Sain, was the contracting party. The indictment alleged that Sain aided and abetted AEC in the commission of the violations of the Act. See 18 U.S.C. S 2.6 Sain contends that he cannot be convicted under the theory that he aided and abetted AEC in violating the Act because he owned and completely controlled AEC. According to Sain, there is no other entity for him to aid or abet because his ownership and control of AEC merge him and corporation into a single entity. Sain relies on United States v. Stevens, 909 F.2d 431 (11th Cir. 1990), which holds that an individual agent of a corporation cannot be convicted of conspiracy when the only other possible party to the

_____

6. Section 2 provides: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal[;] (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

17

conspiracy is the agent's corporation. This is a legal argument, and we exercise plenary review. See United States v. Jefferson, 88 F.3d 240, 241 (3d Cir.), cert. denied, 117 U.S 536 (1996).

Sain's argument is pure sophistry; its fundamental inconsistency is its fatal flaw. It is inconsistent because, on the one hand, Sain contends that AEC, because it is a corporation, is a separate entity that entered into the contract with the Army, thereby insulating him personally from any criminal liability for the fraud. On the other hand, relying on Stevens, Sain asserts that given his stock ownership and control of AEC, he and the corporation are actually the same entity and, therefore, he cannot, in essence, aid and abet himself.

Although a corporation has certain limitations imposed by the particular statute permitting its creation, it is a separate legal entity, with an existence "independent of individuals who compose it." William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations S 5, at 441 (Permanent ed. 1990); see also Wooddale, Inc. v. Fidelity and Deposit Co. of Maryland, 378 F.2d. 627, 631 (8th Cir. 1967). A corporation is not in reality a person, but the law regards it as "distinct and separate from the individual stockholders. It has a real existence with rights and liabilities as a separate legal entity." Fletcher S 7, at 445. This is true even if a single individual owns and controls all of the corporation's stock. See id. S 14, at 463.

One of the principal reasons why individuals choose the corporate form is that it is a separate entity and offers protection from personal liability for its debts. See Walkovszky v. Carlton, 223 N.E.2d 6, 7 (N.Y. 1966) ("The law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability"). Like individuals, corporations may sue and be sued, enter into contracts, see N.J. Stat. Ann. S 14A:3-1(1) (listing duties and privileges of corporation); 15 Pa. Con. Stat. Ann. S 1502(a)(2) (same), and be separately convicted of and sentenced for criminal offenses. See United States v. Hughes Aircraft Co., Inc., 20 F.3d 974, 978 (9th Cir. 1993). AEC, because it is a corporation, is a separate legal entity, even though Sain owned all the stock. Thus, it has the

18

capacity of being aided and abetted. To hold otherwise would allow the controlling stockholder of a corporation to enjoy the benefits of the corporate form, protection from personal liability for corporation's debts, without accepting the burden of assuming criminal responsibility when the individual causes the corporation to commit a crime. Indeed, Sain, by his conduct, recognized and exploited AEC's existence as a separate entity; he caused AEC to sign the contract with the Army in order to protect himself from personal liability. If a corporation is permitted to perform the wide range of functions listed above, we see no reason why it cannot be used by its officers and agents to commit a crime as contemplated by 18 U.S.C. S 2(b).

Even assuming that Sain is correct that it was impossible for him to conspire with AEC, that conclusion does not preclude imposition of aiding and abetting responsibility. Arguably, Sain could not conspire with AEC because AEC could not form the mental state required to conspire with another. This is because a corporation is a conspirator only pursuant to respondeat superior liability. If an agent of the corporation conspires with another individual, the corporation for which the individual is the agent may be criminally liable. However, there must be at least two natural individuals for a conspiracy involving a corporation to exist because two entities must have the required mental state to form a conspiracy. The aiding and abetting statute allows for broader liability and does not require proof that an unwitting entity being used to commit the crime possessed any mental state. See 18 U.S.C.S 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."); see also United States v. Curran, 20 F.3d 560, 567 (3d Cir. 1994) ("A defendant charged under section 2(b) with willfully causing another person to file a false report, can be convicted even if that intermediary was unaware that the document was inaccurate.") (citations omitted). Only the person causing the unwitting entity to act must possess the knowing mental state. See 20 F.3d at 567. Therefore, an individual who causes a corporation to commit a crime is criminally liable for the corporation's criminal conduct as an aider and abettor even if the corporation does not act with a knowing

19

mental state. United States v. Dotterweich, 320 U.S. 277, 284 (1943). For that reason, conviction of Sain was proper even assuming arguendo that Sain caused AEC to unwittingly commit the crime. Thus, the district court committed no error in sustaining Sain's conviction as an aider and abettor.

E.

Sain next argues that the district court erred when it refused to admit the testimony of defense expert Henry Foster, a metallurgist, on the ground that Foster's testimony was irrelevant and confusing. According to Sain's proffer, Foster would have testified that it was against Sain's interest to perform unnecessary carbon change outs because the change outs damaged the adsorbers. Foster also would have testified that he observed signs that carbon had collected on the sides of the adsorbers and had been scraped from that position. This second aspect of Foster's testimony would have rebutted the Government's suggestion that Sain allowed the carbon build up along the inside of the tanks making his calculation of the amount of his use of carbon based on volume inaccurate. This court reviews the district court's conclusion to exclude evidence for abuse of discretion. United States v. Eufrasio, 935 F.2d 553, 571–72 (3d Cir. 1991).

The district court excluded the part of Foster's testimony dealing with Sain's disincentive to perform unnecessary change outs, concluding that it was not relevant and was misleading. The court reasoned that the Government had not claimed that Sain performed unnecessary change outs or that the type and amount of carbon that Sain used were ineffective. Hence, the testimony was misleading and irrelevant, according to the district court, because Sain was improperly attempting to suggest to the jury that he was permitted to make false claims to recoup the damages made to the tanks.

This conclusion was not an abuse of discretion. The Government's theory was not that Sain used ineffective quantities or qualities of carbon. To the contrary, the Government agreed that Sain had performed the number of

change outs claimed, had not performed any unnecessary change outs, and agreed that the type and amount of carbon used was entirely effective in treating the waste water. Hence, Foster's testimony did not relate directly or indirectly to any issue in the case or corroborate or dispute any evidence or contention of the parties. The court also correctly ruled that the evidence had the potential to mislead the jury into believing that Sain was permitted to recoup the alleged damage to AEC's tanks by submitting false claims. In complicated cases such as this, where jurors are required to sift through hundreds or even thousands of documents, hear the testimony of dozens of witness, and consider such esoteric issues as the relative effectiveness of virgin and reactivated carbon or the level of contaminants in waste water, the district court must be permitted to keep the jury's attention focused on the issues by excluding irrelevant and even misleading evidence.

As to the portion of Foster's testimony relating to his observation that carbon had built up on the side of the adsorbers and been scraped away, contrary to Sain's claim, the district court specifically stated several times that Foster would be permitted to testify as to this matter. Sain declined to call Foster for this purpose. Hence, the district court committed no error.

F.

Sain next argues that the district court erred when it determined that he inflicted losses of $597,124 on the United States as a result of his fraudulent scheme. He argues this error affected both his base offense level under the United States Sentencing Guidelines and the amount of restitution imposed. The findings of fact underlying the district court's determination of the loss for guidelines purposes are subject to review for clear error. United States v. Maurello, 76 F.3d 1304, 1308 (3d Cir. 1996). The appropriateness of a particular restitution award is reviewed for abuse of discretion. Id.

Specifically, Sain claims the district court committed two errors. First, he argues that the court underestimated the amount of carbon used in the change outs because the

21

court did not consider 25,000 pounds referred to in an AEC employee's affidavit submitted by Sain prior to sentencing and also rejected Sain's contention that the 1,000-pound bags of carbon, in fact, contained 1,400 pounds. Second, Sain contends that the court should have subtracted from the loss the amounts he paid for virgin carbon when he used virgin carbon.

The district court did not err in rejecting the affidavit submitted by Sain, especially because the assertion in the affidavit regarding the 25,000 pounds was uncorroborated and had not been subjected to cross-examination. Instead, the court based its findings on much more reliable evidence: a government agent's testimony and the other evidence produced at trial. Further, the district court properly rejected the claim that the 1,000-pound bags actually contained 1,400 pounds of carbon. There was ample evidence introduced at trial that the bags only contained between 1,000 and 1,075 pounds of carbon and that any additional weight was water which could not properly be included in the calculation. For the foregoing reasons, the district court's findings were not clearly erroneous and its imposition of the restitution award was not an abuse of discretion.

The district court also committed no error in refusing to give Sain credit for his occasional use of virgin carbon in the change outs. Indeed, the heart of the scheme charged and proved was that reactivated carbon worked as effectively as virgin carbon. Thus, there was never any need to use virgin carbon and Sain's representations that virgin carbon had to be used allowed him to charge the Government unnecessary sums.

G.

Finally, Sain challenges the district court's increase of his base offense level under the sentencing guidelines based on a finding that he possessed a special skill and used that skill to significantly facilitate his commission of the offense. See U.S.S.G. S 3B1.3. On the basis of this finding, the district court increased Sain's offense level by two points. This court reviews for clear error the district court's finding

22

that Sain possessed a special skill and used it to significantly facilitate the offense. See Maurello, 76 F.3d at 1308. Relying on United States v. Hickman, 991 F.2d 1110, 1112–13 (3d Cir. 1993), Sain argues that his special skill did nothing more than enable him to convince the Army to trust him; once he gained this trust, the fraud he perpetrated was "garden variety."

To impose this enhancement, the district court mustfind that: (1) the defendant possessed a special skill and (2) used it to significantly facilitate the commission of the offense. See Maurello, 76 F.3d at 1314. Here, the district court found that Sain possessed special skills relating to his education as a professional engineer, his experience with waste-water treatment, and his "intimate knowledge" of the design and workings of the AEC waste-water treatment plant. The court concluded that those skills gave credence to Sain's insistence to the Army that only virgin carbon and only 20,000 pounds of it per change out would properly treat the waste water. The court also concluded that Sain's skills enabled him to determine that less expensive carbon and less of it would still clean the waste water as effectively as the amounts and types described in the claims he submitted to the Army.

There was ample credible evidence produced at trial to support these findings. Without those skills and credentials, Sain could not have gained the Army's confidence and convinced it to use the amounts and type of carbon upon which he insisted. Sain's skills and guile not only influenced the Army to rely on him but also deterred it from independently determining that less expensive and fewer pounds of carbon would have been equally effective. Indeed, the fraud was anything but garden variety. It is hard to imagine how anyone without a special skill would be capable of committing such a complex fraud as the one in this case.

IV.

Accordingly, the judgment and sentence of the district court will be affirmed.

23

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit