John MANNIX, Petitioner,

v.

William PHILLIPS, Superintendent, Green Haven Correctional Facility, Respondent.

No. 04CIV 1335RCC GWG.

United States District Court, S.D. New York.

Sept. 9, 2005.

John Mannix, Pro Se.

Sheryl G. Feldman, Assistant District Attorney, New York City, NY, for Respondent.

## ORDER ACCEPTING REPORT AND RECOMMENDATION

CASEY, District Judge.

On November 13, 2000, a New York State jury found Petitioner John Mannix ("Petitioner") guilty of murder and criminal possession of a weapon in the third degree. The trial court sentenced Petitioner to eighteen years in prison. On February 25, 2003, the Appellate Division upheld Petitioner's conviction and subsequently denied his request for leave to appeal to the New York Court of Appeals. This *pro se* petition for a writ of habeas corpus followed. The Court referred the matter to Magistrate Judge Gabriel W. Gorenstein for a report and recommendation ("Report").

In a reasoned and thorough Report dated May 25, 2005, Magistrate Judge Gorenstein recommended that the petition be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, Magistrate Judge Gorenstein warned the parties that they had ten days to file their objections to his Report. No objections have been filed. Accordingly, the Court may adopt those portions of the Report to which the parties do not object and with which it finds error. *Pizarro v. Bartlett*, 776 F.Supp. 815 (S.D.N.Y.1991).

The Court, having reviewed the Report, is satisfied that there is no clear error and accepts and adopts the Report in its entirety. As Petitioner has not made "a substantial showing of the denial of constitutional right," a certificate of appealability will not issue, 28 U.S.C. § 2253(c).

## REPORT AND RECOMMENDATION

GORENSTEIN, United States Magistrate Judge.

John Mannix brings this petition *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to set aside a judgment of conviction issued on November 13, 2000 by the New York State Supreme Court, New York County. Mannix was convicted following a jury trial of murder in the second degree (New York Penal Law ("N.Y.P.L.") § 125.25(2)) and criminal possession of a weapon in the third degree (N.Y.P.L. § 265.02(4)). He was sentenced to a prison term of 18 years on the murder conviction and a concurrent term of five years on the weapons possession charge. He is currently incarcerated at the Green Haven Correctional Facility in Stormville, New York. For the reasons stated below, Mannix's petition should be denied.

### I. BACKGROUND

#### A. Evidence at Trial

##### 1. The Prosecution's Case

At about three in the afternoon of February 25, 2000, Mannix entered McKenna's Tavern, a neighborhood bar on 14th Street between Seventh and Eighth Avenues in Manhattan. (McElduff: Tr. 241–42, 246). Bartender Kevin McElduff was working at the time. (McElduff: Tr. 245–46). McElduff had known Mannix "pretty much all [his] life" and saw Mannix two or three times a week at McKenna's. (McElduff: Tr. 244–45). He served Mannix beer and screwdrivers until his shift ended at approximately 7:00 p.m. and he was replaced by bartender Shane Rice. (McElduff: Tr. 246–48; Rice: Tr. 487–88). McElduff remained in the bar to have several drinks as a customer. (McElduff: Tr. 245–46; Rice: Tr. 488–89). Rice also knew Mannix personally and saw him several times a week at McKenna's and occasionally outside of the bar. (Rice: Tr. 485–86).

Matthew Torruella, a 23–year old student and production assistant at a local company that did multimedia presenta-

tions, arrived at McKenna's Tavern between midnight and 12:30 a.m. accompanied by his friend Ivyn Tilo and her friend Kenneth Cabrera. (Tilo: Tr. 53–54, 61–63, 133; Cabrera: Tr. 308–10; C. Torruella: Tr. 3–4).

McKenna's was approximately 45 to 50 feet long and 15 to 20 feet wide. (McElduff: Tr. 249). A long bar ran along one side of the tavern and the back wall was lined with mirrors. (McElduff: Tr. 251, 257). Torruella, Tilo, and Cabrera sat at a cluster of tables towards the back of the bar. (Tilo: Tr. 64, 69, 73; Cabrera: Tr. 310).

The trio had been drinking and talking for less than an hour when Cabrera noticed Mannix at the next table. (Tilo: Tr. 70–72; Cabrera: Tr. 311–13). Cabrera knew Mannix from the neighborhood and considered him a friend. (Cabrera: Tr. 313–14). Cabrera and Torruella had been having a friendly disagreement about whether it was possible to have gay friends and when Cabrera recognized Mannix, he drew him into the conversation, asking, "By the way, you have some friends that are gay, right?" (Cabrera: Tr. 311–13; *accord* Tilo: Tr. 71–73). Mannix acknowledged that he did have gay friends and what began as a discussion between Torruella and Cabrera quickly escalated into a heated argument between Mannix and Torruella. (*See* Tilo: Tr. 76–79; Cabrera: Tr. 317–21). When Mannix asked Torruella, "[W]hat if your brother was a homo[?]" Torruella began to get "real angry." (Cabrera: Tr. 319–20; *accord* Tilo: Tr. 78–79). Torruella stood up and began pointing a finger at Mannix. (Tilo: Tr. 79; Cabrera: Tr. 320–21). Mannix also rose out of his seat and someone (either Torruella or Mannix) "flipped the table over." (Tilo: Tr. 79; *accord* Cabrera: Tr. 321–22). The two began to struggle—"wrestling" (Tilo: Tr. 80), pushing, and shoving

each other (McElduff: Tr. 254; Cabrera: Tr. 324–26). Tilo saw Mannix and Torruella exchange punches. (Tilo: Tr. 80, 82).

Mannix initially ended the confrontation by pinning Torruella against a wall. (Cabrera: Tr. 325–26). Cabrera said a few times, "Jack, don't hit him." (Cabrera: Tr. 326; *accord* Cabrera: Tr. 328). Mannix replied, "I'm not going to." (Cabrera: Tr. 326; *accord* Cabrera: Tr. 328). The two men separated and the fight appeared to be over. (Tilo: Tr. 80–81, 83; McElduff: Tr. 255; Cabrera: Tr. 326–28). As Mannix began backing away, however, Torruella "sucker-punched" him in the face. (Tilo: Tr. 83–85; Cabrera: Tr. 326–29; Rice: Tr. 496–98, 532). Mannix's nose began to bleed and he appeared angry. (Rice: Tr. 497–98).

Tilo grabbed Torruella and pulled him inside the ladies' room in the back of the tavern, locking the door. (Tilo: Tr. 85–88; Rice: Tr. 498–501). The ladies' room was a one-person restroom, approximately four feet by eight feet in size. (McElduff: Tr. 249–50). The room had a sink facing the door, a toilet to the right of the sink, and a mirror on the wall. (Tilo: Tr. 88–89, 115; McElduff: Tr. 250). Once in the bathroom, Tilo leaned against the wall and partially on the door, while Torruella stood in front of the sink facing her. (Tilo: Tr. 90–92, 115).

About a minute after Torruella fled to the bathroom, Mannix followed. (McElduff: Tr. 258; Rice: Tr. 501). He began pounding and kicking the door for between thirty seconds and two minutes. (McElduff: Tr. 258–59, 261; Cabrera: Tr. 392–93; Rice: Tr. 503–05, 507). Cabrera testified that he heard a bang on the door, saw Mannix turn and face him, then heard a big "pound noise." (Cabrera: Tr. 336–37). Rice, however, testified that she heard three sounds, at least one which sounded like a gunshot, while Mannix was still in

front of the door. (Rice: Tr. 506–08, 630–34). From inside the bathroom, Tilo heard two loud noises that sounded like someone throwing himself against the door. (Tilo: Tr. 90–92).

At the time Mannix was pounding on the bathroom door, Cabrera estimated that there were 30 other people in McKenna's at the time and he could not see if anyone else touched the bathroom door. (Cabrera: Tr. 334–36, 338–39). McElduff and Rice gave different estimates as to the number of people in the bar but neither saw anyone as close to the bathroom as Mannix. (McElduff: Tr. 260; Rice: Tr. 502–03, 588–89, 623–25, 627). Rice reported that the other patrons had left the bathroom area "trying to stay away from the commotion." (Rice: Tr. 588).

Right after the noise stopped, Torruella said to Tilo, "I got shot," and pulled up his shirt to show Tilo a gunshot wound in his chest. (Tilo: Tr. 92–95). Tilo testified that Torruella walked a few steps, leaned heavily against the wall of the bathroom, and then slumped to the floor. (Tilo: Tr. 96). Cabrera came over to the bathroom and knocked on the door, but Tilo did not respond for several minutes as she was trying to "wake Torruella up." (Tilo: Tr. 98, 104; Cabrera: Tr. 341). When Tilo finally opened the door a few minutes later, she was "hysterical" and yelling for someone to call the police. (Rice: Tr. 521; accord McElduff: Tr. 262–63).

The witnesses testified that Mannix had turned around and walked away when the noises stopped. (McElduff: Tr. 260–61; Cabrera: Tr. 338–40; Rice: Tr. 509–10). Sometime after leaving the scene, Mannix called the bar. (Rice: Tr. 524–25). When Rice picked up the phone, Mannix asked, "Did I hit anyone?" (Rice: Tr. 525). Rice answered, "Yes." (Rice: Tr. 525). Mannix replied, "[G]ood," and Rice hung up the phone. (Rice: Tr. 525).

Responding to a call, an ambulance arrived at the intersection of West 14th Street and Eighth Avenue at 2:51 a.m. (Storey: Tr. 15). A few seconds after arriving, a man waived toward the paramedics. (Storey: Tr. 16). The paramedics approached and the man pointed toward McKenna's and told them that someone had been shot inside. (Storey: Tr. 17). One paramedic, concerned for his safety and the safety of his partner, asked if the shooter was "still around." (Storey: Tr. 18). The man on the street pointed west and said "he went that way." (Storey: Tr. 19).

The paramedics found Torruella on the floor of the ladies' room of McKenna's with a single gunshot wound to his chest and noted that he had no pulse, was not breathing, and was apparently unconscious. (Storey: Tr. 21–26). The paramedics put him on a stretcher and wheeled him out to the ambulance. (Storey: Tr. 29). They attempted to resuscitate Torruella to no avail. (See Storey: Tr. 25–33). By the time the ambulance reached the hospital, Torruella was "clinically dead." (Storey: Tr. 33).

Detective Michael Glynn was assigned to investigate the homicide. (Glynn: Tr. 742). Glynn conducted an investigation at the scene and interviewed witnesses at the precinct (Glynn: Tr. 742–43), following which he identified Mannix as the suspect. (Glynn: Tr. 743). Glynn returned to the scene to look more closely at the door and saw that the bullet hole was "dead center" in the middle of the door at approximately chest level. (Glynn: Tr. 756–57).

Detectives recovered a spent shell and live round from the floor outside of the ladies' room. (DeSimone: Tr. 177, 184–85, 195, 197). The ballistics expert testified that the live round did not travel through the barrel of a gun, but could have been

ejected if the gun had jammed and the shooter pulled the slide back to eject the bullet. (Tamburri: Tr. 219–20). When asked if the gun could fire without anyone touching the trigger, the expert also testified that, as with any gun, "you have to put your finger in [sic] the trigger and give it that pull to make it go off," and that pressure between four to eight pounds was usually necessary to fire a gun. (Tamburri: Tr. 239–40).

On February 28th, Mannix appeared at the precinct and was arrested. (Glynn: Tr. 752, 784–85).

## 2. *Mannix's Case*

The defense called Matthew Kane, who had known Mannix for several years from the neighborhood and from working together at a moving company. (Kane: Tr. 915–17, 919–20). Kane had gone to McKenna's sometime in the late afternoon after work on the day of the shooting. (Kane: Tr. 904). Kane did not stay at McKenna's all evening, but went back and forth between McKenna's and a Mexican bar next door. (Kane: Tr. 905–06). While at McKenna's, Kane testified that he and Rice used cocaine together in the bathroom several times and that he gave her an ecstacy pill. (Kane: Tr. 904–05, 906, 912). He also mentioned seeing Rice drinking alcohol behind the bar. (Kane: Tr. 906–07). Kane left the bar around 10:00 or 11:00 p.m., was not present for the fight, and did not learn about the shooting until the following day. (Kane: Tr. 907).

## B. *Jury Charge, Verdict, and Sentence*

Mannix was charged with one count of murder in the second degree, one count of manslaughter in the second degree, and criminal possession of a weapon in the second and third degrees. (Charge: Tr. 1066–81). Mannix's attorney requested that the court instruct the jury on the lesser crime of criminally negligent homicide but the court denied the request. (Tr. 943–46, 953–59).

As the court explained to the jury, the indictment charged Mannix with murder in the second degree, which requires a showing that "under circumstances evincing a depraved indifference to human life, [he] recklessly engaged in conduct which created a grave risk of death to another person, and thereby caused the death of Matthew Torruella." (Charge: Tr. 1068). Mannix was also charged with the lesser included offense of manslaughter in the second degree, reckless homicide, for "recklessly caus[ing] the death of another person." (Charge: Tr. 1070).

After explaining the charges, the court instructed the jury to "consider these crimes from the greater to the lesser"— first considering the murder charge then the manslaughter charge. (Charge: Tr. 1072). The court told the jury that if they found Mannix guilty of murder, they must not consider the manslaughter charge. (Charge: Tr. 1073).

The jury found Mannix guilty of murder and of criminal possession of a weapon in the third degree. (Verdict: Tr. 1110–11). Mannix was sentenced to a term of 18 years for the murder conviction and a concurrent term of five years for the weapons charge. *See* Answer, filed Aug. 23, 2004 (Docket # 6), ¶ 3.

## C. *Direct Appeal*

Mannix, represented by counsel, raised the following claims on direct appeal to the New York Appellate Division, First Department:

1. The conviction should be reversed as a matter of law and in the interest of justice because the verdict of depraved indifference murder is not supported by legally sufficient evidence or adequate

evidence and is against the weight of the evidence.

2. The court erred in instructing the jury only on reckless homicide and refusing to give a requested instruction on the lesser included offense of criminally negligent homicide.

3. The court erred in yielding to Shane Rice's refusal to answer questions on cross-examination and in sustaining an objection to defense counsel's commenting on this refusal in summation.

4. The court erred in permitting the prosecutor to impeach Kenneth Cabrera with his grand jury testimony pursuant to CPL § 60.35 based on his trial testimony during cross-examination.

5. The court erred in admitting the paramedic's testimony that he was told before entering the bar that "he went that way," and in refusing to instruct the jury that this statement was not admitted for its truth, even after the jury asked for a readback of the paramedic's testimony relating to "is the shooter still at the scene."

Brief of Defendant–Appellant, dated Apr. 30, 2002 (annexed to Petition for a Writ of Habeas Corpus, filed Feb. 18, 2004 (Docket # 1) ("Petition"), and reproduced as Ex. A to Memorandum of Law and Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus, filed Aug. 23, 2004 (Docket # 8) ("Resp.Mem.")) ("App. Br."), at 14, 24, 35, 51, 53. In a supplemental brief, Mannix argued that his "conviction for murder in the second degree under a theory of depraved indifference to human life must be vacated because the statute under which he was convicted, Penal Law section 125.25(2), is unconstitutionally vague." See Supplemental Brief and Appendix of Defendant–Appellant, dated Nov. 8, 2002 (annexed to Petition and reproduced as Ex. B to Resp. Mem.) ("Supp.App.Br."), at 1. The government

opposed the appeal. See Brief for Respondent, dated Dec. 2002 (reproduced as Ex. C to Resp. Mem.).

On February 25, 2003, the Appellate Division upheld Mannix's conviction. See People v. Mannix, 302 A.D.2d 297, 756 N.Y.S.2d 33 (1st Dep't 2003). The court first held that the depraved indifference statute was not unconstitutionally vague and that "[d]epraved indifference murder and second-degree manslaughter remain separate crimes, both facially and as interpreted." Id. at 297, 756 N.Y.S.2d 33 (citations omitted). The court noted that "[i]n any event, the Supreme Court of the United States 'has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.' " Id. (quoting United States v. Batchelder, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)).

The Appellate Division also found that Mannix's conviction was based on legally sufficient evidence and was not against the weight of the evidence. Summarizing the evidence, the court concluded that it "permitted the inference that the discharge of the pistol was no accident, and that defendant had acted with depraved indifference to human life." Id. at 297–98, 756 N.Y.S.2d 33. The court also concluded that because the jury convicted Mannix of second degree murder when they were also presented with the option of second degree manslaughter, the "refusal to charge the more remote lesser included offense of criminally negligent homicide cannot be a basis for reversal." Id. (citations omitted). The court rejected all of Mannix's remaining claims. Id. at 298–99, 756 N.Y.S.2d 33.

In April 2003, Mannix sought leave to appeal to the New York State Court of Appeals. See Letter to the Hon. Stuart

M. Cohen, Clerk of the Court, New York Court of Appeals, dated Apr. 24, 2003 (reproduced as Ex. F to Resp. Mem.). The application was opposed by the District Attorney's office. *See* Letter from Sheryl Feldman, Assistant District Attorney, to the Hon. Victoria A. Graffeo, dated June 26, 2003 (reproduced as Ex. H to Resp. Mem.). Leave to appeal was denied on September 12, 2003. *See* Certificate Denying Leave, dated Sept. 12, 2003 (reproduced as Ex. J to Resp. Mem.).

### D. *The Instant Petition*

On February 18, 2004, Mannix filed this petition for habeas corpus *pro se*. *See* Petition. Mannix's Petition raises the same six points of law that were raised in his appellate briefs. *See* Petition at 3, 6. The government responded on August 23, 2004. *See* Answer, filed Aug. 23, 2004 (Docket # 6). Mannix has submitted a Traverse. *See* Traverse and Reply Memorandum of Law to Habeas Corpus Petition, dated Nov. 23, 2004 ("Traverse"). In the Traverse, Mannix concedes that "Points Three, Five and Six" are procedurally barred and requests that these claims be dismissed without prejudice. *See id.* at 3 & n. 1. Thus, the only claims Mannix continues to assert as grounds for habeas relief are that New York's depraved murder statute is unconstitutionally vague, that his conviction was not supported by legally sufficient evidence, and that the trial court erred in refusing to instruct the jury on the lesser included offense of criminally negligent homicide. *See id.* at 7–28.

## II. *LAW GOVERNING REVIEW OF HABEAS CORPUS PETITIONS*

█ A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Errors of state law are not subject to federal habeas review. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Rather, a petitioner must demonstrate that his or her conviction resulted from a state court decision that violated federal law. *See, e.g., id.* at 68, 112 S.Ct. 475.

█ For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir. 2001). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered "on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. *Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001); *accord Rosa v. McCray,* 396 F.3d 210, 220 (2d Cir.2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision.")

In *Williams v. Taylor,* the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set

288

forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams* also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

## III. *DISCUSSION*

As discussed above, Mannix bases his claim for habeas relief on three grounds. He claims that: (1) N.Y.P.L. § 125.25(2) is unconstitutionally vague, (2) his conviction is not supported by legally sufficient evidence, and (3) the trial court erred in refusing to instruct the jury on the lesser included offense of criminally negligent homicide. *See* Petition at 3, 6; Traverse at 7–28. Each claim is discussed in turn.

### A. *Unconstitutional Vagueness*

■ Mannix seeks to overturn his murder conviction on the basis that the definition of "depraved indifference to human life" in New York's second degree murder statute is unconstitutionally vague. *See* Petition at 3, 6; Traverse at 25–28. He argues that the concept of depraved indifference murder has traditionally applied to murders with a level of culpability beyond

mere recklessness, but that the New York Court of Appeals has been expanding the definition of depraved indifference murder to encompass crimes that are indistinguishable from reckless manslaughter. *See* Supp.App. Br. at 1–2. Mannix contends that because the difference between depraved indifference murder and reckless manslaughter is no longer "well understood" in New York and "does not prohibit the proscribed conduct 'with sufficient definiteness,'" the depraved indifference statute is unconstitutionally vague. *Id.* at 5 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).

To adjudicate Mannix's claim, we first consider New York law discussing the distinction between depraved indifference murder and manslaughter. Next, we discuss whether the depraved indifference statute, considered in isolation, is unconstitutionally vague. Finally, we consider the question of whether there is any constitutional infirmity in the co-existence of the two statutes in the face of Mannix's argument that they can be construed as covering the same conduct.

### 1. *Depraved Indifference Murder and Manslaughter*

Under New York law, "[a] person is guilty of murder in the second degree when ... [u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y.P.L. § 125.25(2). A person is guilty of manslaughter in the second degree when he "recklessly causes the death of another person." N.Y.P.L. § 125.15(1). A person is said to act recklessly with regard to a particular result or to a circumstance

when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

N.Y.P.L. § 15.05(3).

The Court of Appeals clarified the basis of depraved indifference murder in *People v. Register*, 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d 704 (1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2159, 80 L.Ed.2d 544 (1984), distinguishing it from both intentional murder and reckless manslaughter. First, the court affirmed that "recklessness is the element of mental culpability required" in the depraved indifference statute and thus "the focus of the offense is not upon the subjective intent of the defendant, as it is with intentional murder, but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct." *Id.* at 277, 469 N.Y.S.2d 599, 457 N.E.2d 704 (internal citations omitted). The court then explained that the requirement that conduct occur " 'under circumstances evincing a depraved indifference to human life' . . . refers to neither the *mens rea* nor the *actus reus*" but

rather to "the factual setting in which the risk creating conduct must occur." *Id.* at 276, 469 N.Y.S.2d 599, 457 N.E.2d 704. Accordingly, while depraved indifference murder "resembles" reckless manslaughter, the difference between the statutes is based upon the different factual circumstances under which each crime is committed. *Id.* In other words, "in a depraved mind murder the actor's conduct must present a *grave* risk of death whereas in manslaughter it presents the lesser *substantial* risk of death." *Id.* (emphasis added). The court attributed this distinction to the "inability to quantify homicidal risks in precise terms." *Id.*[1]

The Court of Appeals recently reaffirmed this reasoning in *People v. Sanchez*, 98 N.Y.2d 373, 748 N.Y.S.2d 312, 777 N.E.2d 204 (2002). The *Sanchez* court cited *Register* at length, and noted that it is the "defendant's disregard of the risk [which] elevates and magnifies the degree of recklessness, itself establishing the required circumstances evincing depraved indifference to human life." *Id.* at 381, 748 N.Y.S.2d 312, 777 N.E.2d 204.

### 2. *Constitutional Vagueness Doctrine*

The next issue we consider is whether the depraved indifference murder statute is unconstitutionally vague. The constitu-

---

1. Two district court cases have granted writs of habeas corpus under 28 U.S.C. § 2254 on vagueness grounds with respect to convictions for depraved indifference murder: *St. Helen v. Senkowski*, No. 02 Civ. 10248 (S.D.N.Y. Sept. 22, 2003) (CLB) (Docket #21), and *Jones v. Keane*, 2002 U.S. Dist. LEXIS 27418 (S.D.N.Y. May 22, 2002) (CLB). Both decisions were reversed because the vagueness challenges had not been exhausted and were procedurally defaulted. *See St. Helen v. Senkowski*, 374 F.3d 181 (2d Cir.2004) (per curiam), *cert. denied*, —— U.S. ——, 125 S.Ct. 871, 160 L.Ed.2d 785 (2005); *Jones v. Keane*, 329 F.3d 290, 295–96 (2d Cir.), *cert. denied*, 540 U.S. 1046, 124 S.Ct. 804, 157

L.Ed.2d 693 (2003). The lower courts in *Jones* and *St. Helen* both characterized the standard in the murder statute as encompassing a "very substantial" risk of death. *St. Helen*, No. 02 Civ. 10248, at 9 (quoting *Register*, 60 N.Y.2d at 276–77, 469 N.Y.S.2d 599, 457 N.E.2d 704); *Jones*, 2002 U.S. Dist. LEXIS 27418, at *11 (same). The phrase "very substantial," however, is taken from *Register'* s elucidation of the meaning of "grave risk." 60 N.Y.2d at 277, 469 N.Y.S.2d 599, 457 N.E.2d 704. Accordingly, while it is not a critical point, this Court construes the depraved indifference statute as invoking a "grave"—not "very substantial"—risk of death.

tion requires that a penal law "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855 (citing cases). *Kolender* involved a penal statute whose enforcement raised First Amendment concerns. The Supreme Court has made clear, however, that where—as here—a statute does not implicate First Amendment interests, "the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (citing cases); *accord United States v. Whittaker*, 999 F.2d 38, 42 (2d Cir.1993); *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.), *cert. denied*, 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993).

█ Courts apply a two-part test to determine whether a statute is unconstitutionally vague as applied. "[T]he court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" *United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir.1992) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)) (some alterations in original), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993).

a. *Adequacy of Notice*

██ As "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice," a vagueness challenge "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Cartwright*, 486 U.S. at 361, 108 S.Ct. 1853. The touchstone inquiry is "whether the statute, ei-

ther standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *accord Parker v. Levy*, 417 U.S. 733, 757, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir.1999), *cert. denied*, 531 U.S. 823, 121 S.Ct. 67, 148 L.Ed.2d 32 (2000). In the words of the Second Circuit, "[b]ecause the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *Nadi*, 996 F.2d at 550 (citations omitted); *cf. United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954) ("The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."). In order to sustain a vagueness challenge, therefore, "the complainant must prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (citations and internal quotation marks omitted).

There can be no serious argument that the language of the depraved indifference statute did not put Mannix on notice that his actions were "criminal" or "proscribed." Put succinctly, shooting through a door into a small enclosed room with two people locked inside is conduct that a per-

son of ordinary intelligence would know is criminal. Moreover, the proscription on creating a "grave" risk of death constitutes, at a minimum, a "comprehensible normative standard."

A separate doctrine supports this conclusion. The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*" *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (citing cases); *cf. Advance Pharm. Inc. v. United States,* 391 F.3d 377, 398 (2d Cir.2004) (a "scienter requirement generally saves a statute from unconstitutional vagueness") (citations omitted). The depraved indifference statute contains a "reckless" scienter requirement. *See* N.Y.P.L. § 125.25(2). In reviewing New York's "reckless endangerment" statute, N.Y.P.L. § 120.20, the Second Circuit found it not to be vague in part because " 'a scienter requirement may mitigate a law's vagueness especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.' " *Einaugler v. Supreme Court of State of N.Y.,* 109 F.3d 836, 842 (2d Cir. 1997) (quoting *Vill. of Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186).

Finally, even *Jones*—one of the two cases arising out of this district that found constitutional infirmities in the statutory scheme at issue—concurs that "the concept of depraved indifference to human life is well understood, and is essentially self-defining notwithstanding the confusing glosses placed on the statute by *Register* and its progeny." *Jones,* 2002 U.S. Dist. LEXIS 27418, at \*12; *see also St. Helen,* No. 02 Civ. 10248, at 8 (the term "depraved indifference to human life" "may well be sufficient to give adequate warning to a non-lawyer member of the public as to what conduct is rendered unlawful by the statute"). For these reasons, the depraved indifference statute meets the "adequate notice" prong of the vagueness test.

b. *Arbitrary Enforcement*

The second prong of the vagueness analysis requires the court to determine whether the statute provides sufficient guidance to law enforcement personnel such as police officers, prosecutors, and juries who must enforce and apply the law. *See Kolender,* 461 U.S. at 358, 103 S.Ct. 1855 ("Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.") (citation and internal quotation marks omitted). The Second Circuit has noted that "effective law enforcement often requires the exercise of some degree … of prosecutorial judgment but this alone does not render a statute unconstitutional." *Nadi,* 996 F.2d at 552 (internal citation and quotation marks omitted) (alteration in original).

■ Mannix does not argue that the concept of "recklessness" is somehow unconstitutional under this prong. Nor can it be said that the phrase "conduct which creates a grave risk of death to another person" constitutes an insufficient standard to guide prosecutors or juries. While determining the application of the "grave risk" standard requires an exercise of judgment on the part of a prosecutor or juror, "most statutes must deal with the untold and unforeseen variations on factual situations and the practical necessities of discharging the business of government inevitably limit[s] the specificity with which legislatures can spell out prohibitions." *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952). Thus, in order to invalidate a statute on the ground that it fails to

sufficiently direct law enforcement, the challenge must do more than assert the "speculative danger of arbitrary enforcement." *Vill. of Hoffman Estates,* 455 U.S. at 503, 102 S.Ct. 1186.

Courts have routinely upheld against vagueness challenges the use of language in a statute that is not capable of precise application but rather calls for an exercise in judgment on the part of an interpreter of the statutory language. *See, e.g., United States v. X–Citement Video, Inc.,* 513 U.S. 64, 78–79, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("lascivious"); *Parker,* 417 U.S. at 752–58, 94 S.Ct. 2547 ("conduct unbecoming an officer"); *United States v. Monroe,* 178 F.3d 304, 308–09 (5th Cir.1999) ("maliciously"), *cert. denied,* 528 U.S. 1010, 120 S.Ct. 511, 145 L.Ed.2d 395 (1999); *United States v. Ashman,* 979 F.2d 469, 487 (7th Cir.1992) ("pattern of racketeering activity"), *cert. denied,* 510 U.S. 814, 114 S.Ct. 62, 126 L.Ed.2d 32 (1993); *Sharkey's, Inc. v. City of Waukesha,* 265 F.Supp.2d 984, 992–94 (E.D.Wis.2003) ("unreasonably") ("[a]n objective test ... helps to guard against the risk of arbitrary enforcement"); *United States v. Mitlof,* 165 F.Supp.2d 558, 561–62 (S.D.N.Y.2001) ("fraud, neglect, connivance, misconduct, or violation of law"); *United States v. Fitzgerald,* 676 F.Supp. 949, 952 (N.D.Cal. 1987) ("serious bodily injury"). Given the wide range of statutory language of variable meaning that has passed constitutional muster on this prong, we cannot say that the term "grave risk of death" encourages arbitrary enforcement. Thus, the deliberate indifference murder statute is not unconstitutionally vague.

### 3. *Claim Based on the Similarity of the Murder and Manslaughter Statutes*

■ Mannix's main argument, however, is not that the depraved indifference stat-ute standing by itself is unconstitutionally vague. Rather, it is that the *difference* between it and the manslaughter statute is either indiscernible or non-existent and that the congruence between the two statutes renders his conviction constitutionally infirm. Indeed, this is the argument on which the district court in *Jones* and *St. Helen* granted habeas relief.

As an initial matter, we note that there is no need to enter into the debate concerning the nature of the distinction between the statutes. Even assuming *arguendo* that there is no distinction at all between the conduct covered by the depraved indifference murder statute and the conduct covered by the manslaughter statute, there is no clearly established federal constitutional principle permitting this Court to grant habeas relief.

The Supreme Court has spoken directly on the sort of challenge mounted by Mannix here. In *Batchelder,* the Seventh Circuit vacated the sentence of a felon convicted under a federal gun possession statute because there existed a different statute that criminalized identical conduct but that mandated a lesser sentence. *Batchelder,* 442 U.S. at 116–17, 99 S.Ct. 2198. The Seventh Circuit reasoned that because a prosecutor's discretion to charge under either statute could produce "unequal justice," it was doubtful that "this form of legislative redundancy was constitutional." *Id.* at 124, 99 S.Ct. 2198. The Supreme Court reversed, however, ruling that a defendant had "no constitutional right to elect which of two applicable ... statutes shall be the basis of his indictment." *Id.* at 125, 99 S.Ct. 2198. The Court noted that prosecutorial discretion was subject to constraints imposed by the equal protection clause, which prohibits selective enforcement " 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' "

*Id.* at 125 n. 9, 99 S.Ct. 2198 (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)).

Thus, *Batchelder* makes clear that where two separate statutes cover identical conduct, there is no constitutional infirmity in giving the prosecution discretion to choose which of the two statutes it wishes to use as a basis for a charge against a defendant—"so long as it does not discriminate against any class of defendants." *Id.* at 123–24, 99 S.Ct. 2198; *accord Pike v. Santucci,* 1987 WL 6397, at *2–*3 (E.D.N.Y. Jan.29, 1987) (no constitutional infirmity even if two statutes with different punishments could be construed as reaching identical conduct); *see generally United States v. Edmonson,* 792 F.2d 1492, 1497 (9th Cir.1986) ("When, as here, conduct violates more than one criminal statute the government may generally elect which statute it wishes to charge.") (citing cases).

Mannix has provided no evidence—or even an argument—that the prosecution's choice to prosecute him for the killing of Torruella under the deliberate indifference statute arose from some impermissible basis such as race, religion, or some other arbitrary classification. Thus, Mannix has

pointed to no constitutional infirmity in his prosecution. Certainly, he has not shown that the State court unreasonably applied *Batchelder* or any other Supreme Court precedent in rejecting his vagueness challenge.

Here, unlike *Batchelder,* the two purportedly identical statutes were both presented to the jury. This distinction is of no consequence, however, inasmuch as the jury was specifically instructed to consider the elements of the murder charge first. (Tr. 1072). They were also told that if they found the elements of the murder charge had been proven, they "must not give any consideration" to the manslaughter charge. (Tr. 1073). Thus, the jury was not afforded discretion to choose which charge to invoke against Mannix. No federal constitutional principle forbids such a procedure.[2]

### B. Sufficiency of Evidence Supporting Conviction

▆▆ Mannix's second argument in support of his petition for habeas relief is that his conviction for murder in the second degree is not supported by legally sufficient evidence. *See* App. Br. at 14–21; Traverse at 7–16.[3] He argues that the

---

**2.** The district court in *Jones* concluded that "when two different statutes ... reach the same conduct, or indistinguishable conduct, and one carries a far lesser penalty, allowing a grand jury to choose to indict for either one is a clear denial of equal protection." 2002 U.S. Dist. LEXIS 27418, at *12–*13. *St. Helen* similarly concluded that "[t]he Supreme Court learning clearly reflects that the Equal Protection and Due Process Clauses of the Fourteenth Amendment prevent two penal statutes from reaching indistinguishable conduct, where one statute carries a far lesser penalty than the other." No. 02 Civ. 10248, at 17–18. *Jones* gives no citation for its conclusion. *St. Helen* cited *Kolender*—emphasizing its requirement that there not be a definition of a crime that encourages "arbitrary and discriminatory" enforcement. *Id.* at 18.

But, as already noted, this prong of *Kolender* is satisfied with respect to the deliberate indifference statute taken on its own. *See* Section III.A.2.b above. Because the district court opinions in *Jones* and *St. Helen* are inconsistent with *Batchelder* (a case not cited in either opinion), this Court must respectfully decline to follow them.

**3.** Mannix initially raised a claim that his conviction was against the weight of the evidence, *see* Petition at 3, 6, but he does not press this claim in his Traverse. To the extent he is pursuing such a claim, it must be rejected because a "weight-of-the-evidence" claim implicates only state law and thus is not cognizable on habeas review. *See, e.g., Howie v. Phillips,* 2004 WL 2073276, at *3 (S.D.N.Y.

prosecution introduced no evidence that would support a finding that he had fired a gun under circumstances demonstrating depraved indifference to human life. App. Br. at 14–21. Essentially, he claims that "since none of the witnesses saw the defendant point a gun in any way, or even straighten up or stand back, there is no evidence that the gun, tightly gripped during the banging and thumping, did not discharge accidentally incident to the concussions against the door." *Id.* at 14–15. Thus, he asserts that the "evidence that the defendant deliberately fired the gun and thus acted with reckless disregard for life and depraved indifference to it is lacking." *Id.* at 15.

This claim was first raised before the Appellate Division, which held that "[t]he evidence warranted the conclusion that defendant knowingly and deliberately fired a pistol through a door into a small, enclosed space containing the victim and a bystander." *Mannix,* 302 A.D.2d at 297, 756 N.Y.S.2d 33. The court noted that Mannix's call to the bar following the shooting to find out whether he had hit anyone—coupled with his response of "good" upon learning that someone had been hit—"permitted the inference that the discharge of the pistol was no accident, and that defendant had acted with depraved indifference to human life." *Id.* at 297–98, 756 N.Y.S.2d 33. Accordingly, the court held that the verdict "was based on legally sufficient evidence and was not against the weight of the evidence." *Id.* at 297, 756 N.Y.S.2d 33.

Mannix bears a "very heavy burden" in challenging the sufficiency of the evidence underlying his conviction. *See, e.g., Knapp v. Leonardo,* 46 F.3d 170, 178 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied,* 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). To

succeed, Mannix must show that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Where the record supports competing inferences, the habeas court must " 'presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Wright v. West,* 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (quoting *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781). This deference is due to "assessments of the weight of the evidence [as well as] the credibility of witnesses." *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir. 1996); *accord Rosa v. Herbert,* 277 F.Supp.2d 342, 347 (S.D.N.Y.2003).

Here, the evidence was easily sufficient for a jury to conclude that Mannix fired the shot into the ladies' room recklessly and not accidentally. Mannix had just been in a physical confrontation with Torruella which ended when Torruella punched him in the face. Witnesses saw Mannix banging and kicking the bathroom door. The shot went through the center of the door and hit Torruella in the center of his chest. A gun expert testified that a person would have to apply pressure on the trigger for the gun to go off and stated that the live round found at the scene could be explained if the gun had jammed and the shooter pulled the slide back to eject the bullet. Finally, Mannix called to ask whether he had hit anyone, and responded "good" when he was told that he had.

From this circumstantial evidence, a rational juror could infer that Mannix's gun did not accidentally discharge, but rather that Mannix recklessly engaged in conduct

Sept.17, 2004); *Reid v. Phillips,* 2004 WL 1920218, at *7 (S.D.N.Y. Aug.26, 2004).

that created "a grave risk of death" to the persons inside the ladies' room. A fortiori, it was not an unreasonable application of Supreme Court law for the Appellate Division to so conclude.[4]

## C. Erroneous Jury Instruction

■■ Mannix argues that the trial court erred when it instructed the jury on reckless homicide but refused to give a requested instruction on the lesser included offense of criminally negligent homicide. Traverse at 17–24.

As noted above, a habeas petition will not be granted on any claim adjudicated on the merits in state court unless the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). This claim was clearly adjudicated on the merits. The Appellate Division held that "[s]ince the court submitted the lesser included offense of second-degree manslaughter but the jury convicted defendant of second-degree murder, the court's refusal to charge the more remote lesser included offense of criminally negligent homicide cannot be a basis for reversal." Mannix, 302 A.D.2d at 298, 756 N.Y.S.2d 33.

This determination was not contrary to clearly established Supreme Court precedent. While the Supreme Court has held that the failure to submit lesser included offenses is a violation of Due Process in capital cases, see Beck v. Alabama, 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65

L.Ed.2d 392 (1980), it has expressly reserved the question of whether the rule applies in non-capital cases. Id. at 638 n. 14, 100 S.Ct. 2382. Because, there is no "clearly established" federal right to a charge on a lesser-included offense, a state court's decision not to instruct the jury on a lesser-included offense in a non-capital case necessarily cannot be "contrary to, or involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1). Moreover, "[s]ince a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule," the Second Circuit has held that Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), "precludes ... consideration of the issue" on habeas review. Jones v. Hoffman, 86 F.3d 46, 48 (2d Cir.1996) (per curiam). Thus, a claim that a state court failed to charge a lesser-included offense is not cognizable in a federal habeas corpus proceeding. See, e.g., Peakes v. Spitzer, 2004 WL 1366056, at *12–*13 (S.D.N.Y. June 16, 2004) (Report and Recommendation), adopted by, 2004 WL 1656568 (S.D.N.Y. July 23, 2004); Lindsey v. Fischer, 2004 WL 112884, at *7 (S.D.N.Y. Jan.23, 2004); Pritchett v. Portuondo, 2003 WL 22472213, at *11 (S.D.N.Y. Oct.31, 2003) (Report and Recommendation), adopted by, Order, dated Mar. 1, 2004 (Docket # 22 in 02 Civ. 824); Till v. Miller, 1998 WL 397848, at *4 (S.D.N.Y. July 16, 1998).

4. The New York Court of Appeals has held that a defendant may not properly be convicted of depraved indifference murder where the facts reflect that the murder resulted only from an intentional act. See, e.g., People v. Payne, 3 N.Y.3d 266, 786 N.Y.S.2d 116, 819 N.E.2d 634 (2004); People v. Gonzalez, 1 N.Y.3d 464, 775 N.Y.S.2d 224, 807 N.E.2d 273 (2004); People v. Hafeez, 100 N.Y.2d 253, 762 N.Y.S.2d 572, 792 N.E.2d 1060 (2003); see also Policano v. Herbert, 2004 WL 1960203, at *2 (E.D.N.Y. Sept.7, 2004) (habeas relief granted where defendants was convicted of "recklessly causing a murder that, according to the evidence, he intentionally committed if he committed at all"). These cases do not govern here, however, because the factual circumstances in Mannix's case easily support the view that the homicide was committed as the result of a reckless act.

## CONCLUSION

For the foregoing reasons, Mannix's petition should be denied.

### Notice of Procedure for Filing of Objections to this Report and Recommendation

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard C. Casey, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned at 40 Centre Street, New York, New York 10007. Any requests for an extension of time to file objections must be directed to Judge Casey. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

May 25, 2005.